1  Brian R. Strange, Bar No. 103252
   E-mail: lacounsel@earthlink.net
2  Keith Butler, Bar No. 215670
   E-mail: kbutler@strangeandcarpenter.com
3  STRANGE & CARPENTER
4  12100 Wilshire Blvd., Suite 1900
5  Los Angeles, California 90025
   Telephone: (310) 207-5055
6  Fax: (310) 826-3210
7
8  Attorneys for Plaintiff

9

10              UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
11

12  LIVE NATION ENTERTAINMENT,   )  Case No. CV13-06635-RSWC (Ex)
13  INC.,                        )
                                 )
14  Plaintiff,                   )  **COMPLAINT FOR:**
                                 )
15     vs.                       )  **VIOLATIONS OF SHERMAN ACT**
                                 )  **(15 U.S.C. § 1)**
16                               )
17  VISA, INC., VISA U.S.A., INC.; VISA  )  **VIOLATIONS OF CARTWRIGHT**
18  INTERNATIONAL SERVICE        )  **ACT (CAL. BUS. & PROF. CODE §§**
    ASSOCIATION; MASTERCARD      )  **16720 *et seq.*)**
19  INCORPORATED; MASTERCARD     )
20  INTERNATIONAL INCORPORATED;  )
    AND DOES 1-10,               )  **JURY TRIAL DEMANDED**
21                               )
22  Defendants.                  )

23

24

25

26

27

28

                                1
                            Complaint

1       Plaintiff, by its undersigned attorneys, allege for its Complaint against Visa

2   U.S.A., Inc., Visa International Service Association, and Visa, Inc. (collectively,

3   "Visa"), MasterCard Incorporated and MasterCard International Incorporated

4   (collectively, "MasterCard"), and DOES 1-10:

5   **I.    JURISDICTION AND VENUE**

6       1.    This Complaint is filed under Section 4 of the Clayton Act, 15 U.S.C.

7   Section 15, for damages resulting from violations of Section 1 of the Sherman Act,

8   15 U.S.C. § 1.  This Court has jurisdiction over Plaintiffs' federal antitrust claims

9   under 28 U.S.C. §§ 1331 and 1337.

10      2.    This Court has original jurisdiction over Plaintiffs' state-law claims

11  under 28 U.S.C. § 1332, as the parties are citizens of different states, and the

12  amount in controversy exceeds $75,000.  This Court has supplemental jurisdiction

13  over the state-law claims pursuant to 28 U.S.C. § 1367.

14      3.    Venue in the Central District of California is proper under 28 U.S.C. §

15  1391 and 15 U.S.C. § 22.  Defendants transact business and are found in the Central

16  District of California. Hundreds of Visa and/or MasterCard Member Banks issue

17  Visa and MasterCard Payment Cards and/or acquire retail Merchant transactions for

18  Visa and/or MasterCard in the Central District of California.  A substantial part of

19  the interstate trade and commerce involved and affected by the alleged violations of

20  the antitrust laws was and is carried on in part within the Central District of

21  California.    The acts complained of have had, and will have, substantial

22  anticompetitive effects in the Central District of California.

23  **II.   INTRODUCTION**

24      4.    Visa, MasterCard, and their member banks have collectively imposed

25  restraints on Merchants that have the effect of fixing prices for interchange by

26  restricting competition between the Visa and MasterCard networks and between

27  banks that issue Visa and MasterCard payment cards.  Despite the networks' and

28  the banks' attempts to avoid antitrust liability by re-structuring the Visa and

1   MasterCard corporate entities, their conduct continues to violate the Sherman Act.
2   In this Complaint, Live Nation Entertainment, Inc. ("Live Nation" or "Plaintiff"),
3   seeks monetary damages to compensate it for the overcharges caused by the illegal
4   conspiracies alleged herein.  Plaintiff's allegations are based upon knowledge with
5   respect to its own acts and upon information and belief with respect to all other
6   matters.  The allegations in this Complaint should be read in the alternative, if
7   necessary, to avoid inconsistency.

8       5.   Plaintiff operates commercial businesses throughout the United States
9   that have accepted Visa and MasterCard Payment Cards as forms of payment, along
10  with cash, checks, travelers checks, and other plastic Credit, Debit, and Charge
11  Cards.

12      6.   Plaintiff challenges the collusive and anticompetitive practices of the
13  Defendants under the antitrust laws of the United States and the State of California.
14  The contracts, combinations, conspiracies, and understandings entered into by the
15  Defendants  harm  competition  and  impose  upon  Plaintiff  supracompetitive,
16  exorbitant, and collectively-fixed prices in the Relevant Markets defined below.

17  **III.   DEFINITIONS**

18      7.   As used in this Complaint, the following terms are defined as:

19          a.   "Acquiring Bank" or "Acquirer" means a member of Visa and/or
20               MasterCard that acquires payment transactions from Merchants and
21               acts as a liaison between the Merchant, the Issuing Bank, and the
22               Payment-Card  Network  to  assist  in  processing  the  payment
23               transaction.  Visa and MasterCard rules require that an Acquiring
24               Bank be a party to every Merchant contract.  In a typical payment
25               transaction, when a customer presents a Visa or MasterCard card
26               for payment, the Merchant relays the transaction information to the
27               Acquiring Bank. The Acquiring Bank then contacts the Issuing
28               Bank via the network for authorization based on available credit or

1    funds.  Acquiring Banks compete with each other for the right to
2    acquire payment transactions from Merchants but do not compete
3    on the basis of the interchange fee, which is the subject of this
4    Complaint.

5    b.    "All-Outlets Rule" is a rule of the Visa and MasterCard Networks
6          that requires a Merchant with multiple outlets to accept Visa or
7          MasterCard, respectively, in all of its outlets, even if those outlets
8          are owned by a separate corporate entity, operated under a different
9          brand name, or employ a different business model in order for the
10         Merchant to receive the interchange rates for which the Merchant
11         would ordinarily qualify.

12   c.    "Anti-Steering Restraints" are the rules of the Visa and MasterCard
13         Networks that forbid Merchants from incenting consumers to use
14         less expensive payment forms, including: the No-Surcharge Rule;
15         the No-Discount Rule; the No-Minimum-Purchase Rule; and the
16         Networks' so-called "anti-discrimination rules," which prohibit
17         Merchants from treating any other Payment Card or medium more
18         advantageously than the Defendants' cards.   The Defendants'
19         standard-form-Merchant   agreements   proscribe   steering   by
20         preventing Merchants from establishing procedures that favor,
21         discourage, or discriminate against the use of any particular Card.

22   d.    "Authorization" is the process by which a Merchant determines
23         whether a cardholder is authorized by his or her Issuing Bank to
24         make a particular transaction. The Merchant sends the cardholder's
25         information to its Acquiring Bank or a Third-Party Processor,
26         which sends it to Visa or MasterCard, which then sends it to the
27         issuer or the issuer's processor, to obtain authorization.   If
28         authorization is given, the process is repeated in reverse.

e.  "Charge Card" or "Travel & Entertainment Card" (T&E) is a Payment Card enabling the holder to purchase goods and services on credit to be paid on behalf of the holder by the issuer of such device. Typically, the contractual terms of such cards require that payment from the holder to the issuer be made in full each month, for all payments made on behalf of the cardholder by the issuer during the preceding month.  The issuer does not extend credit to the holder beyond the date of the monthly statement, nor does it impose interest charges on the balance due except as a penalty for late payment. Examples of Charge Cards are the American Express Green, Gold, Platinum, and Centurion cards as well as the Diners Club and Carte Blanche cards issued by Citibank.

f.  "Credit Card" is a Payment Card enabling the holder to (i) effect transactions on credit for goods and services purchased, which are paid on behalf of the holder by the issuer of such devices; or (ii) obtain cash with credit extended by the issuer.  Credit Cards permit consumers to borrow the money for a retail purchase from the card issuer and to repay the debt over time, according to the provisions of a revolving-credit agreement between the cardholder and the issuer.  Examples of Credit Cards are the Visa and MasterCard Credit Cards issued by members of the Defendant bank card networks, as well as the Discover and Private Issue cards issued by Morgan Stanley, Dean Witter & Co., and the Optima and Blue-type cards issued by American Express.  Proprietary cards of individual Merchants for use only at particular Merchants' outlets are not included in this definition.

g.  "Debit Card" is a Payment Card enabling the holder, among other things, to effect a cash withdrawal from the holder's depository

1    bank account, either at an Automated Teller Machine ("ATM") or a

2    point of sale.

3    h.    "General Purpose Cards" collectively refers to Credit Cards and

4    Charge Cards.

5    i.    The "Honor All Cards" Rules are rules of the Visa and MasterCard

6    Networks that require any Merchant that accepts Visa or

7    MasterCard Credit Cards to accept all Credit Cards that are issued

8    on that Network, and the rules of the Visa and MasterCard

9    Networks that require any Merchant that accepts Visa or

10   MasterCard Debit Cards to accept all Debit Cards that are issued on

11   that Network.

12   j.    "Interchange Fee" in the United States General Purpose Card

13   Network Services market means a fee that Merchants pay to the

14   Issuing Bank through the Network and the Acquiring Bank for each

15   retail transaction in which the Issuer's card is used as a payment

16   device at one of the Acquirer's Merchant accounts. The Interchange

17   Fee is deducted by the Issuing Bank from amounts otherwise owed

18   to merchants on Payment Card transactions, and constitutes a

19   component of and a floor for the Merchant-Discount Fee. The

20   following example illustrates how the Visa and MasterCard

21   Interchange Fees work.  A customer presents a Visa or MasterCard

22   card to a Merchant as a payment method.  The Merchant contacts

23   the Acquiring Bank, itself or through a Third-Party Processor, to

24   authorize the transaction.   The Acquiring Bank submits the

25   transaction to the Network.  The Network relays the transaction

26   information to the Issuing Bank or the Issuing Bank's Third-Party

27   Processor, which approves the transaction if the customer has a

28   sufficient line of credit or available funds.  If the transaction is

authorized through the Network, the Issuing Bank pays the Acquiring Bank the payment amount minus the "Interchange Fee," which is fixed by the Member Banks of Visa and MasterCard. The Acquiring Bank then pays the Merchant the payment amount minus the Interchange Fee and other charges for processing the transaction. The total fee charged the Merchant is often referred to as the "Merchant-Discount Fee." The Interchange Fee is the largest component of the Merchant-Discount Fee. Visa Interchange Fees are fixed periodically by Visa Member Banks, acting through the Visa Board of Directors. MasterCard Interchange Fees are fixed periodically by the MasterCard Member Banks, acting through the MasterCard Board of Directors. "Merchant-Discount Fee" means the total amount that the Merchant pays to its Acquiring Bank for each transaction involving a Visa or MasterCard credit or Offline Debit Card.

k.   "Issuing Bank" or "Issuer" means a member of Visa and/or MasterCard that issues Visa and/or MasterCard branded Payment Cards to consumers for their use as payment systems and access devices. Issuing Banks compete with each other to issue Visa and MasterCard cards to consumers. Visa and MasterCard rules require that all Member Banks issue, respectively, Visa and MasterCard Payment Cards.

l.   "Merchant" means an individual, business, or other entity that accepts payments in exchange for goods or services rendered, as donations, or for any other reason.

m.   "Merchant-Discount Fee" is the total sum that is deducted from the amount of money a Merchant receives in the settlement of Visa and/or MasterCard transactions.   The largest component of the

1        Merchant-Discount Fee is the Interchange Fee.

2        n.    "Miscellaneous Exclusionary Restraints" refer collectively to the All- Outlets Rule, the No-Bypass Rule, and the No-Multi-Issuer Rule.

5        o.    "Network Services" means the services and infrastructure that Visa and MasterCard and their members provide to Merchants through which payment transactions are conducted, including authorization, clearance, and settlement of transactions, and those similar services offered by American Express and Discover.  As they currently are offered by Visa and MasterCard and their Member Banks, Network Services include Network-Processing Services and the Visa and MasterCard Payment-Card Systems that facilitate acceptance of Visa and MasterCard Payment Cards by Merchants.  "Network Services" are sometimes referred to as "Card Acceptance Services" as they relate to Merchants.

16      p.    "Network-Processing Services" are the services that are or may be used for authorizing, clearing, and settling Visa and MasterCard Credit and Debit Card transactions.

19      q.    "No-Minimum-Purchase Rule" is a rule of the Visa and MasterCard Networks that prohibits Merchants from imposing minimum-purchase amounts for Visa and MasterCard Credit-Card purchases.

22      r.    "No-Bypass Rule" is a rule of the Visa and MasterCard Networks that prohibits Merchants and Member Banks from bypassing the Visa or MasterCard system (thereby avoiding the supracompetitive Interchange Fees) in order to clear, authorize, or settle Credit Card transactions even if the Issuing and Acquiring Banks are the same, or even if a Third-Party Processor has agreements with both the Issuing and Acquiring Banks on any given transaction.

s.  "No-Discount Rule" is the mirror image of the No-Surcharge Rule (see below) and was adopted by the Visa association and the MasterCard association long before January 1, 2004.  The Visa "No-Discount" rule forbids merchants from (1) granting to any consumer a discount to use a Visa payment card issued by any particular Visa Issuing Bank but not offered to consumers who use a Visa payment card issued by any other Visa Issuing Bank, and (2) issuing a discount to any consumer to use a non-Visa payment card. Under this rule, the merchant cannot charge a lower price to incentivize or steer the consumer to use a Visa payment card issued by a bank that charges the merchant a lower fee to accept its cards, nor can the merchant charge a lower price to a consumer if the consumer uses the card of a competing card network such as MasterCard or Discover.  The MasterCard "No Discount" rule works in the same way, except that it prevents a merchant from charging a lower price for the use of a non-MasterCard payment card or a lower price for the use of a particular Issuing Bank's MasterCard. The "No-Discount" and "No-Surcharge" rules of Visa prevent a merchant from charging more to a consumer who uses a Visa Card (even if Visa is more costly for the merchant to accept) or less to a consumer who uses a competing network's payment card (even if that competing network's card is less expensive for the merchant to accept).  The MasterCard "No-Discount" and "No-Surcharge" rules operate the same way and similarly preclude all price competition either between competing card networks or between competing Issuing Banks of the same branded card at the point of sale for consumer use of payment cards.  It is contrary to the independent economic self-interest for a bank member of Visa

Complaint

that is also a member of MasterCard to prohibit a merchant from offering a discount to a consumer to use that bank's MasterCard or to prohibit a merchant from offering a discount to consumers to use its card when the merchant does not also offer discounts to consumers using a Visa card issued by a competing Issuing Bank.

t.  "No-Multi-Issuer Rule" is a rule of the Visa and MasterCard Networks, respectively, that prohibits Visa and MasterCard transactions from also being able to be processed over other Networks.

u.  "No-Surcharge Rule" is a rule that was adopted by both the Visa association and the MasterCard association long before January 1, 2004. The Visa "No-Surcharge" rule forbids retail merchants from imposing a surcharge on any Visa payment card transaction so as to either reflect the cost differences among various payment methods or to incentivize (or steer) consumers to use less expensive payment forms.   Similarly, the MasterCard "No-Surcharge" rule forbids retail merchants from imposing a surcharge on any MasterCard payment card and thereby prevents the merchant from using price to either reflect the cost differences among various payment methods or to incentivize (or steer) consumers to use less expensive payment forms.  For example, Merchants are prohibited from surcharging cardholders who use a Visa Credit Card rather than a Discover-branded Credit Card, or use a Premium Credit Card rather than a standard Credit Card, or use a Credit Card rather than another form of payment.  If merchants could surcharge the higher-priced cards, consumers would switch to the lower cost cards. If the association or Issuing Banks did not want to lose transaction volume they would have to lower their Interchange Fees on the higher-priced

cards to competitive levels. Similarly, if merchants could surcharge MasterCard cards and/or Visa cards, the merchant could use price to incentivize consumers to switch to whichever network gave the merchant lower prices. In order to avoid a loss of transaction volume by being targeted for surcharging by merchants, each association would have to lower its prices to competitive levels. Among other effects, the "No-Surcharge" rule eliminates any incentive for either Visa or MasterCard or any other competing card network or any Issuing Bank to charge a lower Interchange Fee because such lower Interchange Fees would not be visible to consumers and will not lead to increased usage by consumers or increased transaction volume for the network or the Issuing Bank that lowered its rates. The "No-Surcharge" rule also gives Visa and MasterCard an incentive to encourage consumers to use the most expensive (to the merchant) payment card rather than the most cost-efficient card or payment method. It is contrary to the independent economic self-interest of each Member Bank of Visa to prevent merchants from surcharging the payment cards of other Member Banks of Visa. Similarly, it is contrary to the independent economic self-interest of each Member Bank of MasterCard to prevent merchants from surcharging the payment cards issued by other Member Banks of MasterCard.

v.   "On-Us Transactions" are transactions in which the Acquiring Bank and the Issuing Bank are the same. Even when the Issuing and Acquiring Banks are identical, Visa and MasterCard require that the Issuing Bank charge an Interchange Fee to the Merchant.

w.   "Payment-Card-System Services" means the standard-setting

functions performed by Payment-Card Networks.  Payment-Card-System Services encompasses the brand of the particular card program, the rules and protocols for providing Merchant acceptance of and conducting Payment-Card transactions under that brand, and the rules and protocols for conducting transactions under that brand. The four leading      providers of Payment-Card-System Services are Visa, MasterCard, Discover, and American Express.

x.  "Payment Card" refers to a plastic card that enables consumers to make purchases from Merchants that accept the consumer's Payment Card.  The term "Payment Card" refers to several different types of cards, including, General-Purpose Cards, Debit Cards, Travel & Entertainment Cards, stored-value cards, and Merchant-proprietary cards.

y.  A "Premium Card" is a General Purpose Card that carries a higher Interchange Fee than a Standard Card and is required by a network to carry a certain level of rewards or incentives to the cardholder. Visa's "Signature" and "Traditional Rewards" card products and MasterCard's "World" card product are examples of Premium Cards.

z.  "Relevant Markets" include markets no broader than the markets for General Purpose Cards and General Purpose Card Network Services, as they are defined and described in Section VIII.

aa.  "Settlement" is the process by which the Merchant is reimbursed for a Payment Card transaction.  While Visa and MasterCard rules require that an Acquiring Bank be a party to all Merchant card-acceptance agreements, Merchants often use Third-Party Processors to process these transactions.  The Acquiring Bank or its processor credits the Merchant's bank account with the amount paid by the

1    cardholder less the Merchant-Discount fee, the largest component
2    of which is the Interchange Fee, and then transmits the transaction
3    data to Visa or MasterCard, which sends it to the Issuing Bank or
4    its Third-Party Processor.  The Issuing Bank then sends payment to
5    the Acquiring Bank through Visa or MasterCard (and possibly the
6    Acquirer's processor).    In a Credit Card transaction, settlement
7    occurs two to four days after authorization and clearing.

8    bb.    "Third-Party Processor" is a firm, other than Visa, MasterCard, a
9    Member Bank, or an entity affiliated with a Member Bank, that
10   performs the authorization, clearing, and settlement functions of a
11   Visa or MasterCard Payment-Card transaction on behalf of a
12   Merchant or a Member Bank.  Examples of Third-Party Processors
13   include First Data and Transfirst.

14   cc.    The "Conspiracy Period" is January 1, 2004, to the present.

15   **IV.    THE PARTIES**

16       8.    Plaintiff Live Nation Entertainment, Inc., is a Delaware corporation
17   and has its principal place of business in Beverly Hills, California.   Plaintiff
18   operates a large number of businesses in a variety of sectors under a variety of
19   names including Live Nation Entertainment, Ticketmaster, and others.   Plaintiff
20   accepts, and has accepted throughout the conspiracy period, payment by Visa and
21   MasterCard General Purpose Cards.  Accordingly, Defendants have imposed and
22   continue to impose supracompetitive Interchange and Merchant-Discount Fees
23   associated with these Visa and MasterCard transactions on Plaintiff and have
24   required and continue to require it to abide by the Anti-Steering Restraints and
25   other restraints that facilitate Defendants' anticompetitive practices.  Plaintiff has
26   directly paid supracompetitive and artificially inflated Interchange and Merchant-
27   Discount Fees to members of each of the unlawful horizontal conspiracies alleged
28   in this Complaint, and has been injured in its business or property as a result of the

1   unlawful conduct alleged herein; further loss or damage is threatened.

2   　　9.　Prior to the March 19, 2008, IPO, Visa U.S.A., Inc. was a member of

3   Visa International Service Association and was a non-stock Delaware membership

4   corporation with its principal place of business in San Francisco, California.  It was

5   a national bank-card association whose members included approximately 14,000

6   banks.  During the relevant time period until the Visa corporate restructuring on

7   March 19, 2008, Visa U.S.A., Inc. was governed by a board of directors composed

8   of bank executives selected from its Member Banks.

9   　　10.　Prior to March 19, 2008, Visa International Service Association was a

10   non-stock Delaware membership cooperation with its principal place of business in

11   Foster City, California.  On March 19, 2008, the Visa entities completed an Initial

12   Public Offering ("IPO").  Under a series of transactions that culminated in the IPO,

13   Visa U.S.A., Inc. and Visa International Service Association became subsidiaries of

14   Visa, Inc., a Delaware corporation.  After the subsidiaries were unified under the

15   ownership of Visa, Inc., the stock of the former members in each subsidiary was

16   acquired by Visa, Inc.  Once the restructuring was completed, Visa, Inc. conducted

17   an IPO of over 400,000 shares of class A common stock.  Visa, Inc. acquired the

18   ownership interest of certain Member Banks in Visa through the redemption and

19   reclassification of approximately 270 million shares of Visa stock previously held

20   by the Member Banks.  Each of the Visa defendants is and has been an active,

21   knowing participant in the alleged Visa activities alleged below.  Defendants Visa

22   International Service Association, Visa U.S.A., Inc., and Visa, Inc. are collectively

23   referred to herein as "Visa."  Visa transacts business in this judicial district.

24   　　11.　Defendant MasterCard Incorporated is a Delaware corporation with its

25   principal place of business in Purchase, New York.  Defendant MasterCard

26   International Incorporated is a non-stock membership corporation and the principal

27   operating subsidiary of MasterCard Incorporated.  MasterCard Incorporated and

28   MasterCard International Incorporated are collectively referred to herein as

1  "MasterCard."  The members of MasterCard International Incorporated are issuing
2  and acquiring banks as defined herein.  Prior to the week of May 22, 2006, 100% of
3  the stock of MasterCard Incorporated was owned and controlled by the bank
4  members of MasterCard International Incorporated.  On May 25, 2006, MasterCard
5  conducted an Initial Public Offering and entered into several related agreements in
6  which MasterCard Incorporated acquired MasterCard International Incorporated
7  stock and then sold to the public some of the stock it acquired.  Pursuant to the
8  terms of that IPO, the members of MasterCard International Incorporated retained
9  operating and effective control of MasterCard Incorporated.    Specifically,
10  subsequent to the IPO, the member banks of MasterCard International Incorporated
11  owned 51% of the Class A voting stock of MasterCard Incorporated and owned
12  additional shares of Class B and Class M stock, which confer on the member banks
13  additional rights to control the business of MasterCard Incorporated.  As a practical
14  matter, MasterCard Incorporated previously was and remains effectively owned and
15  controlled by the 25 member banks that issue approximately 98% of the
16  MasterCard payment cards issued to cardholders in the United States and acquire
17  over 95% of all MasterCard transactions from retail Merchants.  Both MasterCard
18  Incorporated and MasterCard International Incorporated are and have been active
19  and knowing participants in the illegal activity alleged in this Complaint.

20  **V.    CO-CONSPIRATORS**

21       12.    Various persons, firms, corporations, organizations, and other
22  business entities, some unknown and others known, have participated as co-
23  conspirators in the violations alleged and have performed acts in furtherance
24  of the conspiracies.    Co-conspirators include, but are not limited to, the
25  following: (a) Issuing Banks that have issued Visa and/or MasterCard Credit
26  and Debit Cards and have agreed to charge uniform, collectively fixed Visa
27  and MasterCard Interchange Fees for various Merchants and transactions; (b)
28  certain banks that are or were members of the Boards of Directors of Visa or

MasterCard and adopted and agreed to fix Interchange Fees for various Merchants and transactions and to impose the anticompetitive Anti-Steering Restraints and Miscellaneous Exclusionary Restraints alleged herein; and (c) Acquiring Banks that acquire Visa and MasterCard transactions from Merchants, as described herein, and that have participated in the conspiracy to collectively fix Interchange Fees.

13. Plaintiff and other Merchants purchase General Purpose Card Network Services from Visa and MasterCard through the Acquiring Bank members of Visa and MasterCard.

14. The Member Banks of Visa and MasterCard, acting through Visa and MasterCard, set or conspired to set uniform schedules of Interchange Fees for transactions conducted over Visa and MasterCard Networks, and imposed restrictive rules on Merchants that prevent them from using price and price competition to reduce interchange rates to competitive levels. The Visa and MasterCard Boards of Directors have directly set their respective levels of Interchange Fees and, in concert with their respective members, have directly adopted and enforced these restrictive rules. The Member Banks have had actual knowledge of, and have knowingly participated in, the conspiracy to collectively fix uniform schedules of Interchange Fees, and impose upon Merchants, including Plaintiff, the anticompetitive Anti-Steering Restraints.

## VI. TRADE AND INTERSTATE COMMERCE

15. The following trade and interstate commerce is relevant to this action: General Purpose Cards and General Purpose Card Network Services.

16. During all or part of the Conspiracy Period, each of the Defendants, directly or through their affiliates or subsidiaries, participated in the markets for General Purpose Card Network Services in a continuous and uninterrupted flow of interstate commerce.

17. The activities of Defendants and their co-conspirators, as

16

described herein, were within the flow of and had a substantial effect on interstate commerce.

## VII.  FACTUAL ALLEGATIONS

### A.  The Visa and MasterCard Networks

18.  Visa and MasterCard (collectively the "Networks") are international bank-card networks whose members include banks, regional-banking associations, and other financial institutions.

19.  Visa's predecessor, Bank Americard, was the local Credit Card program of Bank of America, then based in California.  In 1970, the program was introduced throughout the United States under the name National Bank Americard, Inc. ("NBI").  In 1977, NBI changed its name to Visa.

20.  MasterCard is the successor to Mastercharge, which was created in 1967 when the Interbank Card Association of New York banks merged with the Western States Bankcard Association.

21.  At their inception, Visa and MasterCard used cumbersome paper records to effect Credit Card transactions.  Over time, technological advances have streamlined and reduced significantly the costs to Visa and MasterCard of processing Credit Card transactions.

22.  Use of Visa and MasterCard cards has increased dramatically.  In 1970, only 16% of households had a credit card.  By 2006, 77% of U.S. adults had at least one credit card.

23.  Since 1970, the number of Visa Member Banks has increased from approximately 1,400 to nearly 14,000 in the United States and over 22,000 worldwide.  U.S. consumers now carry more than 512 million Visa-branded Credit, Debit, commercial, and prepaid cards.

24.  MasterCard has also grown and now includes more than 23,000 Member Banks worldwide.  During 2006, there were over 360 million MasterCard-branded cards in circulation in the United States.

25. The General Purpose Card and Network Services markets today are saturated and mature, with high levels of concentration among both issuing and acquiring banks. The top seven issuers issue more than 90% of all credit cards and the top eight acquiring banks acquire and process more than 90% of all payment card transactions. The cost structure in the General Purpose Card and Network Services markets are also low and decreasing. In a competitive market, low and decreasing costs result in lower and decreasing prices. The anticompetitive practices alleged in this Complaint, however, have increased and are increasing at a rapid rate the prices Merchants pay for Visa and MasterCard payment card services.

26. In contrast to other countries, the fees imposed by banks on Merchants for Payment Card transactions in the United States were throughout the conspiracy period almost completely unregulated by government. Rather, those fees, and the rules that apply to all Payment Card transactions, are privately controlled by Visa, MasterCard, and their Member Banks. Thus, the relevant markets alleged in this complaint can reach equilibrium between supply and Merchants' demand for those services only if market forces are effective. At all times relevant to this action, Visa and its member banks and MasterCard and its Member Banks have conspired to restrain competitive market forces.

**B.     The Networks Impose Interchange Fees On All Payment Card Transactions And Require Member Banks To Adhere To The Anti-Steering Restraints**

27. The Networks operate as standard-setting organizations in the markets for General Purpose Card Network services that facilitate the exchange of transaction data and funds among Merchants, Acquiring Banks, Issuing Banks, and consumers.

28. The Networks monitor and enforce their Member Banks'

18

compliance with their uniform schedule of default Interchange Fees.  Absent a bilateral agreement between the issuing and acquiring banks to a particular transaction, the Networks' IT-systems monitor each transaction to ensure that the "correct" default interchange rate is being applied.  Thus, if the acquiring bank attempted to "cheat" on a particular transaction by applying an interchange rate lower than the default rate, the Networks' systems would intervene and increase the interchange rate to the default rate.

29.    The Networks also require that a Member Bank be a party to every Merchant contract for the acceptance of Visa and MasterCard Payment Cards.   This rule applies even to Merchants and banks that use Third-Party Processors or Independent Sales Organizations.

30.    The Member Banks of Visa and MasterCard impose Interchange Fees on Merchants even for On-Us Transactions, in which the Issuing and Acquiring Banks are the same bank.

31.    Before the Visa and MasterCard IPOs, the Member Banks, acting as members of Visa by and through the Visa Board of Directors, fixed uniform Interchange Fees for various Merchants and transactions for all Visa General Purpose Card transactions that they agreed to impose upon Merchants.

32.    The Member Banks, acting as members of MasterCard by and through the Board of Directors of MasterCard, then set similar uniform Interchange Fees for various Merchants and transactions for all MasterCard General Purpose Card transactions that they agreed to impose upon Merchants.

33.    Before the Visa and MasterCard IPOs, by jointly setting Interchange Fees in both Networks, the Member Banks ensured that the Interchange Fees of Visa and MasterCard increased in parallel and stair-step fashion, rather than decreasing in response to competition from each other. Even after the IPOs, Visa and its Member Banks, and MasterCard and its member banks, undertook no acts that were inconsistent with the purposes and

Complaint

goals of their prior collective actions and undertook no conduct that would defeat those purposes and goals; they continue to act as information conduits for the sharing of pricing and other competitive information between the Networks, thereby ensuring that the Networks' Interchange Fees continue to increase in parallel and stair-step fashion.

34.     Interchange Fees were devised in the early days of the Networks. Interchange Fees purportedly helped pay for the costs of initial card issuance, marketing, transferring transactional paper between Acquiring and Issuing Banks, and purportedly balanced Network costs between Issuers and Acquirers.  These early Interchange Fees were cost-based, and in the case of Visa, set with the help of independent auditing firms.

35.     Interchange Fees were purportedly necessary in the early days of the Networks to induce banks to issue cards to cardholders.

36.     Even if those initially proffered justifications for collectively set, uniform schedules of Interchange Fees once were valid, they no longer are valid.  Interchange Fees are no longer cost-based, and the Networks no longer need to encourage card issuance to establish their Networks.

37.     Technology has evolved greatly since the early days of the Networks, such that the Networks now have the technological capability to facilitate bilateral agreements among Issuing Banks, Acquiring Banks, and Merchants and to facilitate the settlement of funds pursuant to those bilateral agreements.

38.     Issuers, for their part, have the technological capability to enter into bilateral agreements with Merchants and to settle transactions pursuant to such bilateral agreements.

39.     Unlike in the early days of the Networks, Visa and MasterCard now, jointly and separately, have market power in the market for General Purpose Card Network Services.  *See In re Visa Check/MasterMoney*

*Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) (finding that Visa has market power as a matter of law and that fact issues remained with respect to MasterCard).   Even in the face of frequent and significant increases in Interchange Fees, Merchants have no choice but to continue to accept Visa's and MasterCard's dominant cards. *United States v. Visa*, 163 F. Supp. 2d 322, 340 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229, 239-40 (2d Cir. 2003).   In recent years both Visa and MasterCard repeatedly and substantially increased the total Interchange Fees paid by Merchants, but did not experience any decline in Merchant acceptance.

40.   The collective setting of Interchange Fees neither performs the standard setting function of Visa and MasterCard, nor enables the Networks to perform that function.

41.   Given the ubiquity of Visa and MasterCard Payment Cards, banks now would find it in their best interest to issue Visa and MasterCard Payment Cards and acquire Merchants for the Networks, even without the promise of supra-competitive Interchange Fee revenues.

42.   The Visa and MasterCard networks could function efficiently without rules requiring the payment of Interchange Fees on every transaction. Even if the Member Banks of Visa and MasterCard did not fix and agree to abide by uniform schedules of default Interchange Fees, the Visa and MasterCard Networks could continue in their roles as standard-setting organizations for Payment Card transactions.   Many examples of similar networks exist that function efficiently without rules requiring the payment of Interchange Fees on every transaction.   These include the Interac debit card network in Canada, and domestic Payment Card networks in Norway, The Netherlands, Denmark, Finland, Luxembourg and Iceland.   There are even more examples of networks that operate efficiently with dramatically lower Interchange Fees, including payment card networks in all other industrialized

Complaint

1  countries.  These include Australia, The United Kingdom, Mexico, and Spain.

2      43.   The uniform schedules of Interchange Fees and rules requiring

3  the payment thereof are not a core function of the Visa and MasterCard

4  payment card networks.  They are not reasonably necessary to the operation of

5  the Visa and MasterCard networks.  Even if some Interchange Fees were

6  reasonably necessary, Defendants' uniform schedules of Interchange Fees

7  are more restrictive of competition than is necessary to effectuate the business

8  of Visa and MasterCard.

9      44.   Unlike the early days of Visa and MasterCard when Interchange

10  Fees were purportedly based on certain issuer costs, the Networks now set

11  their Interchange Fees based upon their perceptions of the elasticity of

12  demand of Merchants.  This permits the Networks and their Member Banks

13  to identify and impose on each category of Merchants an Interchange Fee that

14  approximates the "reservation price" of Merchants in that category.  This is

15  the pricing strategy typically associated with firms that possess substantial

16  market power.

17      45.   Prior to the IPOs, Member Banks, acting through the Visa and

18  MasterCard Boards of Directors, collectively adopted and enforced rules that

19  require the payment of Interchange Fees, set at Visa and MasterCard's

20  uniform levels, for all transactions on the respective Networks.  Even after the

21  IPOs, the Member Banks agree to abide by these rules.

22      46.   By enacting and enforcing the "Honor All Cards" and

23  Interchange Fee payment rules, the Networks have created a situation in

24  which the payment of an Interchange Fee is required on all transactions,

25  regardless of the Issuing Bank.  Because of this problem – a problem

26  entirely of the Networks' own creation – the Networks now claim that uniform

27  schedules of "fall back" Interchange Fees actually benefit Merchants by

28  preventing the Issuing Bank from "holding up" the Merchant by demanding

1  an Interchange Fee that is as high as the Issuer would like, knowing that the
2  Honor All Cards rule prevents the Merchant from refusing that transaction.

3      47.    But for these rules, Merchants would have the option to reject a
4  given Visa or MasterCard payment card for a given transaction if the
5  benefit the Merchant receives from accepting the card or allowing the
6  transaction is not commensurate with the associated Merchant fee.

7      **C.**    **The Anti-Steering Restraints Insulate The Networks From**
8                   **Inter-Network and Inter-Issuer Competition In The General**
9                   **Purpose Card Network Services Market**

10      48.    Consumers do not know the actual costs of the Interchange
11  Fees and Merchant-Discount Fees paid by Merchants, so Merchants are
12  unable to assist them in choosing more cost-effective payment methods.

13      49.    The Networks impose the No-Surcharge Rule and other Anti-
14  Steering Restraints to prevent Merchants from encouraging consumers to use
15  less-expensive payment methods. Through these rules, Visa and MasterCard
16  have insulated themselves from competitive threat. The No-Surcharge Rule
17  and other Anti-Steering Restraints guarantee that the consumer will select
18  which card to use without regard to the cost to the Merchant of accepting the
19  card; the consumer cannot know how expensive his or her chosen card is to the
20  Merchant.

21      50.    The No-Surcharge Rule is reflected in the rules and Merchant
22  agreements of Visa, MasterCard, and their Member Banks. Under the
23  Member Banks' standard-form Merchant agreements, Merchants "shall not
24  impose any surcharge or fee for accepting a [Visa-branded or MasterCard-
25  branded] Card."

26      51.    As a result, a Network that charges Merchant-Discount Fees that
27  are lower than the Networks' would not be able to steer business away from
28  Visa or from MasterCard. While potential new market entrants and

competitors such as Discover would, in the absence of the Anti-Steering Restraints, be able to compete with the Networks by offering lower fees charged to Merchants, the Networks' rules prevent and restrain such competition.

52.    The Anti-Steering Restraints have an inflationary effect on retail goods and services.   The Networks' rules ensure that Merchants who pass along these costs must raise prices to all consumers, including cash-payers and users of other payment devices who would otherwise seek to avoid the high cost of the Networks' Interchange Fees.   Thus, but for these rules, consumer prices would be lower because those prices would no longer be marked up to reflect the supracompetitive costs of card acceptance.   Instead, those supracompetitive prices would be borne by the consumer choosing to use the Networks' expensive payment products.   Faced with transparent high prices for the Networks' Payment Cards, consumers would seek to use lower cost forms of payment.

53.    In fact, MasterCard admitted, in a submission to the Reserve Bank of Australia, that surcharging can place downward pressure on Merchant fees because "[Networks] set interchange fees to avoid widespread surcharging and other forms of card usage discouragement behavior."

54.    Visa has made similar statements.   Robert Towne, Visa's former Senior Vice President of "acceptance economics," admitted that he believed that charges imposed by Merchants on cardholders would suppress consumers' demand to use Visa-branded Payment Cards.

55.    The No-Surcharge Rule and other Anti-Steering Restraints not only insulate the Networks from competition and raise prices for consumers, they also require the least affluent, who do not use payment cards, to subsidize the buying habits of more affluent consumers who do use payment cards. Because Merchants must mark up the prices of all goods to cover the costs

of accepting Visa and MasterCard products, rather than impose a discrete surcharge on users of those products, the No-Surcharge Rule effectively compels cash payers and users of other low-cost payment forms to subsidize all of the costly perquisites given by Issuing Banks to consumers using more expensive payment forms such as Visa and MasterCard Payment Cards, including frequent-flier miles, rental-car insurance, free gifts, and even cash-back rewards.

56.   The Anti-Steering Restraints also protect the Networks' inflated Interchange Fees.  In the face of Merchant prompting — and particularly faced with the prospect of incurring surcharges — consumers would choose less-expensive payment products, and thereby cause the Networks to drop their Interchange Fees in order to maintain market share.  In the absence of the Anti-Steering Restraints, therefore, the Networks' Interchange Fees would be lower.

57.   Without the Anti-Steering Restraints, Visa, MasterCard, and their member banks would be forced to compete for Merchant acceptance of their respective Payment Cards.

58.   The Anti-Steering Restraints are naked restraints on trade, are not ancillary to the legitimate and competitive purposes of the Networks, and have profound anticompetitive effects.   There are no countervailing procompetitive justifications.

**D.   Issuance and Acquiring Duality Facilitates the Fixing of Interchange-Fees Through Anticompetitive Anti-Steering Restraints**

59.   The Networks' rules permit banks to be members of both Visa and MasterCard and issue both brands of Credit Cards.  This is referred to as "Issuance Duality."  Banks can also "acquire" transactions from Merchants for both Visa and MasterCard.  This is referred to as "Acquiring Duality."  Every

major bank in the United States is a member of both Visa and MasterCard, and thus has the right to issue Payment Cards and acquire Merchants for both the Visa and MasterCard networks.  The U.S. memberships of Visa and MasterCard are virtually identical.  Furthermore, virtually every Merchant that accepts Visa Payment Cards as a form of payment also accepts MasterCard Payment Cards.

60.    Visa and MasterCard Member Banks have historically exerted control over the operations of the competing Networks by simultaneously participating on the Boards of Directors and other important committees of each Network.

61.    The Member Banks' participation in the governance and operations of the competing Networks has continued into the relevant time period in this lawsuit.

62.    In 1992, MasterCard International's Executive Vice President and General Counsel wrote in a letter to the Department of Justice that "when one board acts with respect to a matter, the results of those actions are disseminated to the members who are members in both organizations. As a result, each of the Associations is a fishbowl and officers and board members are aware of what the other is doing, much more so than in the normal corporate environment."   High-ranking Visa executives have also noted the anticompetitive effects of the banks' longstanding dual membership in and ownership of Visa and MasterCard.  For example, in 1992, Visa International's former President and CEO explained that

> "Visa was a better organization [before its owners acquired an interest in MasterCard. [I]t created more, it was more innovative, it was more vital and more imaginative. . . . The real creativity, ingenuity, desire to develop, [and] support from members that made Visa what it is today came before duality because there were groups of banks who wanted to

support Visa to go beat up on MasterCard, and there were groups of banks in MasterCard who wanted to support MasterCard to go beat up on Visa. And they weren't sitting there as shareholders of both organizations not really caring who beat up on whom or if they didn't beat up on anyone or not caring who won. If you've got one foot firmly placed on both sides of the street, who cares. . . . [a]nd I think that not only would the banks have benefited had they gone this way [without duality], but ultimately the consumer would, too . . . ." Compl. ¶ 60, *United States v. Visa U.S.A., Inc. et al.*, No. 98-civ.7076 (S.D.N.Y. Oct. 7, 1998).

That same year, Visa International's Executive Vice President and General Counsel testified that "it is very difficult for us to take a step, an aggressive step that hurts MasterCard because the same banks who sit there on the board, who are in Visa are also in MasterCard." In response to the question whether "duality has led to a decrease in intersystem competition between Visa and MasterCard," he replied, "Absolutely," and when asked whether duality harmed consumers, he answered "I think in the long run they would be better off without duality . . . ." *Id.* ¶ 61.

63.    Before their respective IPOs, the Networks were essentially controlled by a small number of Member Banks — those with the largest shares of card issuance and with the highest sales-transaction volumes. These banks established their control by simultaneously serving on the Boards of Directors and/or important committees of either or, in many cases, both Visa and MasterCard.  This relationship among Member Banks and the Networks has lessened competition between Visa and MasterCard because it makes the Member Banks less willing to implement policies that would increase competition between Visa and MasterCard for the business of Merchants.  The Networks instituted a number of ownership and control restrictions to preserve

27

Complaint

the banks' control even after the IPOs.

64.    Because their memberships are virtually identical, the Networks and their Member Banks communicate frequently, exchange data, and coordinate much of their activity through joint programs and parallel activity. Duality has also facilitated a high degree of uniformity in the services offered by the competing Networks and the Merchant-Discount Fees charged by the Acquiring Banks to Merchants accepting Visa and MasterCard Credit Cards.  This practice has continued even after the Networks' IPOs.

65.    The trend towards uniformity in pricing among dual Visa and/or  MasterCard Member Banks has also been facilitated and exacerbated because -- before the IPOs -- Visa Member Banks collectively fixed the Visa Interchange Fees and contemporaneously, acting as MasterCard members, collectively fixed the MasterCard Interchange Fees.   This trend toward uniformity in pricing has continued even after the IPOs.

66.    Because the Member Banks that were represented on the Visa Board of Directors were all members of MasterCard before the IPOs, and issued MasterCard Payment Cards, they had an economic incentive to ensure that MasterCard Interchange Fees increased in step with Visa Interchange Fees.   As these banks continue to issue cards and acquire Merchants for the Networks, their incentive and ability to prevent competition between Visa and MasterCard continues.

67.    Because the Member Banks that were represented on the MasterCard Board of Directors were virtually all members of Visa before the IPOs, they had an economic incentive to ensure that Visa Interchange Fees increased in step with MasterCard Interchange Fees.   As these banks continue to issue cards and acquire Merchants for the Networks, their incentive and ability to prevent competition between Visa and MasterCard continues.

Complaint

68.     The Member Banks of Visa have exacerbated the effects of duality by causing Visa to enact, publicize and adhere to a policy that Visa "will not be disadvantaged" on Interchange Fees vis-à-vis MasterCard and American Express.     Similarly, the Member Banks of MasterCard have caused MasterCard to adopt a policy of engaging in "competitive response" to increases in Visa's Interchange Fees by "matching" Visa's effective interchange rates, which guarantee that its Interchange Fees do not fall out of line with Visa's.     By causing Visa and MasterCard to adopt these twin policies, the Member Banks have enabled the Networks to require essentially the same Interchange Fees to be paid by Merchants.     Since the explicit adoption of these policies, the average effective interchange rates of Visa and MasterCard have been virtually identical.     When the Banks, acting through Visa, adopted schedules of uniform Interchange Fees to be applied to all Visa transactions, they understood that the same Banks, acting through MasterCard, would match the effective Interchange Fees reflected in the Visa schedules.

69.     The Networks establish matching interchange rate structures in addition to establishing matching effective interchange rates.     For example, both Visa and MasterCard have created segments in their consumer credit group of products.     These segments are based on the level of rewards associated with the product and the higher the level of rewards, the higher the interchange rate.     Similarly, both Visa and MasterCard have created tiers within their interchange rate structures, whereby lower interchange rates apply to high volume Merchants and higher interchange rates apply to lower volume Merchants.

70.     Duality has also facilitated a high degree of uniformity in the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints that the Networks impose on Merchants.

**E.     The Networks' Conduct Harmed Competition**

71.     The rules requiring the payment of Interchange Fees on every transaction, the collective setting of uniform schedules of Interchange Fees, and the continued imposition of these fees on all Merchants that accept Visa and MasterCard Payment Cards restrains competition between Visa and MasterCard Member Banks in the market for General Purpose Card Network Services.   This harms competition by imposing large and ever-increasing Interchange Fees, which thereby elevates Merchant-Discount Fees to supracompetitive levels.

72.     The Anti-Steering Restraints harm competition by allowing Defendants to insulate themselves from competition from lower-priced General Purpose Card Network Service providers, by inflating prices for all consumers, by compelling inequitable subsidies that affect the least-affluent U.S. consumers, and by allowing Defendants to continue their practices of collectively fixing supracompetitive, uniform Interchange Fees.

73.     The damages suffered by Plaintiff continue to accumulate.

**F.     Acquiring Banks Of Visa And MasterCard Have No Ability Or Incentive To Seek Redress For The Collective Fixing Of Interchange Fees**

74.     Visa U.S.A.'s Operating Regulations specify that "Visa has no liability of any nature to any Member arising from any cause or circumstance." This liability limitation "appl[ies] to all products, programs, services, specifications, standards or other matters or items provided by [Visa and its Member Banks]."   Thus, if a Visa Member Bank determined that it was harmed by the uniform schedules of Interchange Fees, Visa's Regulations prevent it from suing Visa.

75.     MasterCard's Bylaws state that "[e]ach member shall…hold harmless [MasterCard]…from any actual or threatened claim, demand, [or] obligation,…resulting      from   and/or   arising   in   connection   with…the

1   compliance or non-compliance with the standards by the member."

2   MasterCard also states in a manual issued to Member Banks that "MasterCard

3   shall have no liability to any member, member processor, or other person

4   acting on behalf of the member for any loss, cost, or other damage arising out

5   of or in connection with MasterCard's administration of or any member's

6   participation in any interchange rate program." Thus, if a MasterCard Member

7   Bank determined that it was harmed by the uniform schedules of Interchange

8   Fees, it could not sue MasterCard.

9       76.   Even if Visa and MasterCard Member Banks were not

10  explicitly prevented from suing Visa and MasterCard over the uniform

11  schedules of Interchange Fees, they have no practical incentive to do so.

12       77.   The Bylaws of Defendant Visa U.S.A. require that all "Principal

13  Member [Banks] [s]hall issue Cards bearing the Visa service mark."

14       78.   Similarly, MasterCard's Bylaws require that Member Banks

15  "must have issued and outstanding a reasonable number of MasterCard cards."

16  If a Member Bank fails to issue the requisite number of cards, it will be

17  assessed a penalty by the MasterCard network.  The reason for these

18  provisions is for all Member Banks to have a common economic interest in

19  ever-rising Interchange Fees.

20       79.   Because all Member Banks are required to issue Visa or

21  MasterCard Payment Cards, all Member Banks benefit from the

22  supracompetitive Interchange Fees that they agree to abide by and, at least

23  until the Networks' reorganizations, collectively set.  Moreover, because

24  acquiring banks do not pay Interchange Fees, they have no economic incentive

25  to sue over the Networks' Interchange Fees.

26       80.   Before the IPOs, the Member Banks appointed the Networks'

27  Boards of Directors and approved of and agreed to abide by the Networks'

28  rules and bylaws.  Before the IPOs, the Member Banks conspired with each

other, with Visa, and with MasterCard to collectively fix uniform schedules of default Interchange Fees. At all times relevant to these claims, the Member Banks have agreed to abide by the rules of Visa and MasterCard, including the rules that require the application of a default Interchange Fee on every Visa and MasterCard transaction.

81. Third-Party Processors do not have any practical incentive or ability to seek redress for the Networks' supracompetitive Interchange Fees; they do not pay Interchange Fees and therefore have not been harmed by the imposition of those fees.

82. Therefore no realistic possibility exists that any Third-Party Processor will sue Visa or MasterCard over any of the practices described in this Complaint.

**G.    Payment Card Systems in Countries Other Than The United States Demonstrate that Rules Requiring the Payment of Interchange Fees on Every Transaction and Collectively Set and Supracompetitive Interchange Fees are Not Necessary to the Functioning of a Payment Card Network**

83. Authorities in several countries have concluded that Visa and MasterCard's collectively-fixed uniform schedule of Interchange Fees and other restraints are anticompetitive and illegal.

84. The European Commission ruled on December 19, 2007 that MasterCard's cross-border Interchange Fee violates Article 81(1) of the E.C. Treaty (renamed and renumbered in 2009 as Article 101(1) in the Treaty on the Functioning of the European Union), Europe's counterpart to Section 1 of the Sherman Act.

85. In its 241-page decision, the Commission rejected arguments that Visa and MasterCard have advanced in class actions against them, including the argument that the Networks' IPOs absolved them of continuing

Section 1 liability, that the relevant market is broader than Payment Cards, and that rules requiring the payment of Interchange Fees on every transaction and collectively-fixed, uniform schedules of Interchange Fees are necessary to the functioning of a four-sided Payment Card Network.

86.    Under the Commission's decision, MasterCard was ordered to cease and desist from its anticompetitive conduct, including its enforcement of its rule requiring the payment of Interchange Fees on all cross-border European transactions.  MasterCard, cut its cross-border interchange fees in 2009 in order to avoid fines.

87.    In May 2012 the European Union's General Court upheld the Commission's decision, finding that Interchange Fee decisions were made by a group of companies even after MasterCard's IPO in 2006, and that cross-border Interchange Fees limits the pressure that merchants can exert on acquiring banks.   "The fact that the [Interchange Fees are] capable of restricting the competitive pressure which merchants are able to exert on acquirers is sufficient to show that there are effects restrictive of competition."

88.    On March 25, 2008, the Commission announced that it was launching an antitrust investigation into the setting of Visa's cross-border Interchange Fees.  At the time, Visa announced that it intended to settle with the Commission, but in July 2012, the Commission issued a Statement of Objections to Visa alleging that its cross-border Interchange Fees and related rules were anticompetitive.   In May 2013, to appease European regulators, Visa agreed to reduce fees by 40 to 60 percent on consumer credit card payments and change its rules to allow merchants, *inter alia*, to shop for lower rates across borders.

89.    Similarly, in 2005 the antitrust-enforcement body in the United Kingdom, the Office of Fair Trading ("OFT"), concluded after a four-year investigation, that MasterCard's domestic Interchange Fees violated the U.K.

1   equivalent to Section 1 of the Sherman Act.

2       90.    In addition to finding that MasterCard had market power in the
3   relevant markets for Payment-Card issuance, acquiring and a "wholesale"
4   market, the OFT also found that the Interchange Fee was used to extract
5   extraneous costs – i.e., those not necessary to the functioning of a Payment
6   Card network.    Two of the "extraneous costs" found by the OFT, the
7   cost of "rewards" and the cost of the interest-free "float" period, are often held
8   up by Defendants as examples of costs that justify the imposition of
9   uniform schedules of Interchange Fees on Merchants.

10       91.    The   Reserve   Bank   of   Australia   ("RBA")   has   also
11   extensively  investigated  its domestic Payment Card industry.  In 2002, as a
12   result of that investigation, the RBA ordered Visa and MasterCard to reduce
13   domestic Interchange Fees by nearly half, from an average of 95 basis points
14   (.95%) before the reforms to approximately 50 basis points today.

15       92.    Before the RBA's reforms, the Networks predicted that any
16   significant reduction in Interchange Fees would lead to disaster, with
17   MasterCard going so far as to assert that the reforms would initiate a "death
18   spiral" that would lead to the collapse of both Payment Card issuance and
19   acceptance.

20       93.    Contrary to the Networks' doomsday speculations, however, the
21   Payment-Card market in Australia prospers after the reforms.  The data
22   since the reforms indicate that card issuance and transaction volumes are up,
23   total costs to Merchants and cardholders have gone down, and banks remain
24   profitable.

25       94.    Experiences from other countries with Payment Card networks
26   that function with zero or minimal Interchange Fees place the final nails in the
27   coffin of the "death spiral" argument.

28       95.    For example, debit card systems in Canada, Norway, Finland,

Germany, Denmark, The Netherlands, and Australia function effectively without Interchange Fees, which are real-world examples of how the Defendants' uniform schedule of Interchange Fees are not necessary to the functioning of a Payment-Card Network.

**H.    The Networks Attempted to Avoid the Antitrust Liability Through Reorganizing into Purported "Single Entities"**

96.    Before their respective IPOs, Visa and MasterCard did not act as single entities when their Member Banks collectively fixed Interchange Fees.  The Visa and MasterCard Member Banks, which effectively controlled the decisions of the Networks, competed against each other in the Relevant Market.  These banks do not nor did they ever share a unity of interest.  Rather, they are direct, horizontal competitors in the Relevant Markets.

97.    The Member Banks did not pool all of their assets to form or operate the Visa and MasterCard networks.

98.    Before the Networks' IPOs, the Member Banks did not owe a fiduciary duty to each other or the Visa and MasterCard networks with respect to the setting of Interchange Fees.

99.    After being adjudicated "structural conspiracies" in the United States, the European Union, the United Kingdom, and several other jurisdictions, the Networks took steps to restructure themselves in an attempt to avoid liability under Section 1 of the Sherman Act and equivalent laws in other countries.

100.  For example, in May 2005, MasterCard's then-CEO Robert Selander noted in a presentation to the European banks that were then represented on MasterCard's Board of Directors that through an IPO, MasterCard wished to terminate the "structural conspiracy previously found to exist by courts in the United States."

101.  On May 22, 2006, MasterCard completed an IPO, which sold a

partial interest in MasterCard to public investors. Through this IPO and related agreements, the surviving entity (hereinafter "New MasterCard") acquired certain of its Member Banks' ownership and control rights in MasterCard. The Member Banks received shares constituting a 49% equity interest in New MasterCard that allowed them to elect up to 25% of the New MasterCard board and gave them veto power over certain of New MasterCard's competitive decisions. New MasterCard financed this acquisition by selling to the public shares representing a 41% equity interest in New MasterCard. A newly-created New MasterCard Foundation was given a 10% equity share in New MasterCard.

102. Leading up to and at the time of the IPO, MasterCard and its Member Banks executed several related agreements, which ensured that the banks would retain significant control over New MasterCard's competitive decisions and prevent New MasterCard from becoming a legitimate competitor to the banks' and Visa's market power in the relevant market. For example, MasterCard and its Member Banks enacted a restriction that limited any one shareholder or group of shareholders from acquiring more than a 15% equity interest in New MasterCard. In addition, the Member Banks retained the right to block New MasterCard from being acquired or exiting its "core business."

103. Through the IPO, MasterCard and its Member Banks intended to preserve its ability to impose supracompetitive fees on Merchants for accepting MasterCard Payment Cards without the risk of liability under Section 1 of the Sherman Act. For example, after the IPO, New MasterCard could impose a card-acceptance fee on Merchants and use the proceeds of that fee to provide kickbacks to Issuing Banks for issuing MasterCard Payment Cards, thereby effectively re-establishing the Interchange Fee, in a way that New MasterCard argues cannot be checked by Section 1. And because New MasterCard has market power in the General Purpose Card and Network

1  Services markets, it can impose anticompetitive Anti-Steering Restraints and
2  supracompetitive card-acceptance fees on Merchants.

3       104.  On March 19, 2008, Visa completed its own IPO.  Under a series
4  of transactions that culminated in the IPO, Visa U.S.A., Visa International,
5  Visa Canada, and Inovant (but not Visa Europe) became subsidiaries of a
6  Delaware corporation known as Visa, Inc. (hereinafter "New Visa" or
7  "Visa, Inc.").  After the subsidiaries were unified in Visa, Inc., the stock was
8  acquired in the former members of each subsidiary.  Once the restructuring
9  was completed, Visa, Inc. conducted an IPO of over 400,000,000 shares of
10 common stock.  This process is essentially the acquisition by Visa Inc. of
11 certain Member Banks' ownership rights in Visa through the redemption and
12 reclassification of approximately 270 million shares of Visa stock previously
13 held by the Member Banks.

14      105.  Avoidance of antitrust liability is a significant motivation to
15 Visa's restructuring efforts.  In light of the parallels to the MasterCard IPO and
16 the fact that Visa's IPO was conducted during the pendency of the class action
17 from which Plaintiff has excluded itself indicate that Visa's intent was also to
18 attempt to shield its conduct in the setting of fees for the Merchants that
19 accept its Payment Cards from antitrust liability.

20      106.  After the IPOs, neither Visa, MasterCard, nor any of the Member
21 Banks took any affirmative action to withdraw from the respective
22 combinations and conspiracies.  To the contrary, even after the IPOs, the
23 Member Banks continued to agree to and to enforce and adhere to the Anti-
24 Steering Restraints that eliminate competition among issuing banks for
25 merchant acceptance.

26 **VIII.**       **RELEVANT MARKETS**

27      107.  A relevant market exists, the product dimension of which is no
28 broader than General Purpose Cards.  *In re Visa Check/MasterMoney*

*Antitrust Litig.*, 2003 WL 1712568, at *3; *United States v. Visa*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001), *aff'd*, 344 F.3d at 239 (2d Cir. 2003). The geographic dimension of this market is the United States. *Id.* at 339-40.

108.   A relevant market exists, the product dimension of which is no broader than General Purpose Card Network Services.   *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3; *United States v. Visa*, 163 F. Supp. 2d at 338.   The geographic dimension of this market is the United States.

109.   Both Visa and MasterCard, together with their Member Banks, jointly and separately, have market power in the market for General Purpose Cards and General Purpose Card Network Services. *United States v. Visa*, 163 F. Supp. 2d at 340.

110.   None of the increases in Visa and MasterCard's Interchange Fees have been attributable to increases in costs associated with the operations of the Networks.

111.   Visa and MasterCard have exercised their market power in the General Purpose Card Network Services market.   As the court noted in the United States' action against the Networks, Visa and MasterCard raised Interchange Fees charged to Merchants a number of times without losing Merchants. *United States v. Visa*, 163 F. Supp. 2d at 340.

112.   Visa and MasterCard have also demonstrated their market power by "price discriminating" in the level of Interchange Fees imposed on various Merchants and for various types of transactions. *United States v. Visa*, 163 F. Supp. 2d at 340.   Since the United States' action, Visa and MasterCard have only increased their price-discrimination practices.

113.   The Networks' price-discrimination among categories of Merchants is not based on cost but is based instead on the Networks' perception of the "elasticity of demand" (*i.e.*, the Merchants' willingness to

pay) of the various categories of Merchants.  The Networks' practice is to impose the highest fees on those Merchants that have the fewest options to discontinue acceptance when fees increase.

114.  The Networks' pricing policies are reflected in the comments of MasterCard's Associate General Counsel before the European Commission in 2007.  The Associate General Counsel discussed that when MasterCard performs a cost study, it attempts to answer the following question:  "How high could interchange fees go before we would start having serious acceptance problems, where Merchants would say: we don't want this product anymore, or by Merchants trying to discourage the use of the card either by surcharging or discounting for cash."  European Commission, Commission Decision of December 19, 2007 Relating to a Proceeding Under Article 81 of the EC Treaty and Article 53 of the EEA Agreement (COMP/34.579; COMP 36.518; COMP 58.580) at 56.

115.  Similarly, Visa determines the level of Credit Card Interchange Fees that it imposes on various categories of Merchants based on the elasticity of demand of those Merchants.

116.  Visa and MasterCard have also forced Premium Credit Cards upon Merchants that accept Visa and MasterCard Credit Cards.  These Premium Cards carry higher Interchange Fees than non-premium cards and many Merchants would refuse to accept them if they had the power to do so. Visa and MasterCard rules require Merchants that accept Visa and MasterCard Credit Cards to also accept these "Premium Cards."  The inability of Merchants to resist the imposition of higher Interchange Fee cards further demonstrates Visa and MasterCard's market power.

117.  There are significant barriers to entry in the General Purpose Card Network Services Market.  Because of these barriers, the only successful market entrant since the 1960's has been Discover, which was introduced by

Sears and benefited from its extensive network of stores, its extensive base of customers who carried Sears' store card, and its relationship with Dean Witter. New entry into the General Purpose Card Network Services Market would cost more than 1 billion dollars and would involve a "chicken-and-egg problem of developing a Merchant acceptance network without an initial network of cardholders who, in turn, are needed to induce Merchants to accept the system's cards in the first place." *United States v. Visa*, 163 F. Supp. 2d at 342.

118.   Visa and MasterCard's substantial market power in the General Purpose Card Network Services Markets has been reinforced by their implementation and enforcement of the Anti-Steering Restraints, which insulate them from competition that would exist in a free market.

119.   As former Federal Trade Commission Chairman (and Visa's paid consultant) Tim Muris noted, "[m]ost Merchants cannot accept just one major card because they are likely to lose profitable incremental sales if they do not take the major payment cards. Because most consumers do not carry all of the major payment cards, refusing to accept a major card may cost the Merchant substantial sales." Timothy J. Muris, Payment Card Regulation and the (Mis)application of the Economics of Two-Sided Markets, 2005 Colum. Bus. L. Rev. 515, 522 (2005).

**FIRST CLAIM FOR RELIEF:**

**AGAINST VISA FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT § 1, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF GENERAL PURPOSE CARD INTERCHANGE FEES**

120.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

121.  Throughout the conspiracy period, Visa and its Member Banks engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

122.  The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, the substantial terms of which were to illegally fix, raise, maintain, or stabilize, through the use of Anti-Steering Restraints, the Interchange Fees that are imposed on Plaintiff and other Merchants in the market for General Purpose Card Network Services.

123.  The Visa Board of Directors, which included representatives from several of the Member Banks, acted on behalf of the Member Banks, to fix, raise, maintain, or stabilize the Interchange Fees for Visa transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

124.  In carrying out the illegal contracts, combinations, and conspiracies described above, Visa and its co-conspirator Member Banks engaged in a number of overt acts, including, without limitation: (1) agreeing to exchange and actually exchanging information about current and future Interchange Fees; (2) agreeing to coordinate and actually coordinating the Interchange Fees they charge to Plaintiff and other Merchants; and (3) agreeing to impose and actually imposing, and enforcing, the Anti-Steering Restraints described above on Plaintiff and other Merchants.

125.  All of the Member Banks of Visa have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

126.  The contract, combination, conspiracy, and agreement alleged in this First Claim has had, and/or is likely to have, among others, the following anticompetitive effects:

a.  Actual and potential competition in the General Purpose Card

Network Services market was substantially excluded, suppressed, and effectively foreclosed;

b. Visa acquired and maintained market power in the relevant markets of General Purpose Card and General Purpose Card Network Services;

c. Visa controlled, maintained, and elevated above competitive levels the Interchange Fees imposed on Plaintiff and other Merchants in the market for General Purpose Card Network Services;

d. Plaintiff and other Merchants were required to pay supracompetitive Interchange Fees for Visa transactions in the market for General Purpose Card Network Services;

e. Plaintiff and other Merchants were required to adhere to anti-competitive Anti-Steering Restraints in the market for General Purpose Card Network Services;

f. Visa derived direct and substantial economic benefits from the supracompetitive Interchange Fees for Visa transactions in the market for General Purpose Card Network Services;

g. But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Visa transactions in the market for General Purpose Card Network Services; and

h. The specific amount of damages suffered by Plaintiff has not yet been determined, as such determination will require additional discovery and expert analysis, but Plaintiff estimates damages will range in the tens of millions of dollars.

127.   The collectively fixed and artificially inflated Interchange Fees and Anti-Steering Restraints are illegal.  They are not necessary to accomplish any procompetitive benefits of the Visa Network.   Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the artificially inflated Interchange Fee and Anti-Steering Restraints are significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieves few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the General Purpose Card Network Services market. The supra-competitive levels of Interchange Fees and the Anti-Steering Restraints continue to the present date.

## SECOND CLAIM FOR RELIEF:

**AGAINST MASTERCARD FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT § 1, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF GENERAL PURPOSE CARD INTERCHANGE FEES**

128.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

129.   Throughout the conspiracy period, MasterCard and its Member Banks engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

130.   The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among MasterCard's issuing and acquiring members, the substantial terms of which were to illegally fix, raise, maintain, or stabilize, through the use of Anti-Steering Restraints, the Interchange Fees that are imposed on Plaintiff

1   and other Merchants in the market for General Purpose Card Network

2   Services.

3       131.   The    MasterCard    Board    of    Directors,    which    included

4   representatives from several Member Banks, acted on behalf of the Member

5   Banks to fix, raise, maintain, or stabilize the Interchange Fees for MasterCard

6   transactions in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

7       132.   In   carrying   out   the   illegal   contracts,   combinations,   and

8   conspiracies described above, MasterCard and its co-conspirator Member

9   Banks engaged in a number of overt acts, including, without limitation: (1)

10  agreeing to exchange and actually exchanging information about current and

11  future Interchange Fees; (2) agreeing to coordinate and actually coordinating

12  the Interchange Fees they charge to Plaintiff and other Merchants; and (3)

13  agreeing to impose and actually imposing, and enforcing, the Anti-Steering

14  Restraints described above on Plaintiff and other Merchants.

15      133.   All   of   the   Member   Banks   of   MasterCard   have   actual

16  knowledge of, and have knowingly participated in, the conspiracy alleged

17  herein.

18      134.   The contract, combination, conspiracy, and agreement alleged in

19  this Second Claim has had, and/or is likely to have, among others, the

20  following anticompetitive effects:

21           a. Actual and potential competition in the General Purpose Card

22              Network   Services   market   was   substantially   excluded,

23              suppressed, and effectively foreclosed;

24           b. MasterCard acquired and maintained market power in the

25              relevant markets of General Purpose Card and General

26              Purpose Card Network Services;

27           c. MasterCard controlled, maintained, and elevated above

28              competitive levels the Interchange Fees imposed on Plaintiff

and other Merchants in the market for General Purpose Card Network Services;

d. Plaintiff and other Merchants were required to pay supracompetitive Interchange Fees for MasterCard transactions in the market for General Purpose Card Network Services;

e. Plaintiff and other Merchants were required to adhere to anticompetitive Anti-Steering Restraints in the market for General Purpose Card Network Services;

f. MasterCard derived direct and substantial economic benefits from the supracompetitive Interchange Fees for MasterCard transactions in the market for General Purpose Card Network Services;

g. But for the anticompetitive conduct of MasterCard and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for MasterCard transactions in the market for General Purpose Card Network Services; and

h. The specific amount of damages suffered by Plaintiff has not yet been determined, as such determination will require additional discovery and expert analysis, but the Plaintiff estimates damages will range in the tens of millions of dollars.

135. The collectively fixed and artificially inflated Interchange Fees and Anti-Steering Restraints are illegal. They are not necessary to accomplish any procompetitive benefits of the MasterCard Network. Even if some horizontal agreement were necessary to promote the efficiencies of the MasterCard network, the artificially inflated Interchange Fees and Anti-

1   Steering Restraints are significantly more restrictive than necessary to bring

2   about those efficiencies.  MasterCard and its Member Banks' price fixing

3   achieves few — if any — procompetitive benefits to counterbalance the price-

4   fixing's demonstrated anticompetitive effects in the General Purpose Card

5   Network Services market.  The supra-competitive levels of Interchange Fees

6   and the Anti-Steering Restraints continue to the present date.

### THIRD CLAIM FOR RELIEF:

**AGAINST VISA FOR VIOLATION OF THE CARTWRIGHT ACT, § 16700**
***ET SEQ.* OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE,**
**UNLAWFUL   PRICE   FIXING   OF   GENERAL   PURPOSE   CARD**
**INTERCHANGE FEES**

12   136.  Plaintiff repeats and re-alleges each and every allegation

13   contained in the foregoing paragraphs with the same force and effect as if

14   fully set forth here.

15   137.  Until its reorganization and IPO, Visa and its Member Banks

16   engaged in unlawful contracts, combinations, and conspiracies in an

17   unreasonable restraint of interstate trade or commerce in violation of § 16700

18   *et seq.* of the Cartwright Act (Cal. Bus. & Prof. Code, § 16700 *et seq.*).  These

19   unlawful contracts, combinations, and conspiracies were entered into and

20   effectuated within the State of California.

21   138.  The unlawful contracts, combinations, and conspiracies consisted

22   of continuing agreements, understandings, and concerts of action between and

23   among Visa's issuing and acquiring members, the substantial terms of which

24   were to illegally fix, raise, maintain, or stabilize, through the use of Anti-

25   Steering Restraints, the Interchange Fees charged to Plaintiff and other

26   Merchants by Issuing Banks in the market for General Purpose Card Network

27   Services.

28   139.  The Visa Board of Directors, which included representatives from

several Member Banks, voted to fix, raise, maintain, or stabilize the Interchange Fees for Visa transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

140. In carrying out the illegal contracts, combinations, and conspiracies described above, Visa and its co-conspirator Member Banks engaged in a number of overt acts, including, without limitation: (1) agreeing to exchange and actually exchanging information about current and future Interchange Fees; (2) agreeing to coordinate and actually coordinating the Interchange Fees they charge to Plaintiff and other Merchants; and (3) agreeing to impose and actually imposing, and enforcing, the Anti-Steering Restraints described above on Plaintiff and other Merchants.

141. All of the Member Banks of Visa have had actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

142. The contract, combination, conspiracy, and agreement has had, and/or is likely to have, among other things, the following anticompetitive effects:

    a. Actual and potential competition in the General Purpose Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

    b. Visa acquired and maintained market power in the relevant markets of General Purpose Card and General Purpose Card Network Services;

    c. Visa controlled, maintained, and elevated above competitive levels the Interchange Fees imposed on Plaintiff and other Merchants in the market for General Purpose Card Network Services;

    d. Plaintiff and other Merchants were required to pay supracompetitive Interchange Fees for Visa transactions in the

47

market for General Purpose Card Network Services;

e. Plaintiff and other Merchants were required to adhere to anticompetitive Anti-Steering Restraints in the market for General Purpose Card Network Services;

f. Visa derived direct and substantial economic benefits from the supracompetitive Interchange Fees in the market for General Purpose Card Network Services;

g. But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees in order to gain business from Merchants; and

h. But for the anticompetitive conduct of Visa, Plaintiff and other Merchants would have saved tens of millions of dollars by avoiding having to pay artificially inflated Interchange Fees.

143. The collectively fixed and artificially inflated Interchange Fees and Anti-Steering Restraints are illegal. They are not necessary to accomplish any procompetitive benefit of the Visa network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa network, the artificially inflated Interchange Fees and Anti-Steering Restraints are significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieved few procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the General Purpose Card Network Services market.

144. As a consequence of Visa's and its Member Banks' illegal combinations and conspiracies in violation of the Cartwright Act, Plaintiff and other Merchants suffered injury to their business and property, in part, because they were charged higher Interchange Fees by Issuing Banks in the market for General Purpose Card Network Services than they would have paid in the

1   absence of the Visa's conduct.  The specific amount of damages suffered by

2   Plaintiff has not yet been determined, as such determination will require

3   additional discovery and expert analysis. The supra-competitive levels of

4   Interchange Fees and Anti-Steering Restraints continue to the present date.

5   **IX.**   **PRAYER FOR RELIEF**

6        WHEREFORE, Plaintiff respectfully prays for judgment in its favor and

7        against Defendants and requests that this Court:

8        A.   Declare, adjudge, and decree that Defendants have committed the

9   violations of the federal and state antitrust laws as alleged herein;

10       B.   Order that Defendants, their directors, officers, employees, agents,

11  successors, members, and all persons in active concert and participation with

12  them be enjoined and restrained from, in any manner, directly or indirectly,

13  committing the violations of the Cartwright and Sherman Acts, in which

14  they and co-conspirators have been engaged;

15       C.   Order that Defendants, their directors, officers, employees,

16  agents, successors, members, and all persons in active concert and

17  participation with them be enjoined and restrained from, in any manner,

18  directly or indirectly, committing any other violations of statutes having a

19  similar purpose or effect; and

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

D.    Pursuant to applicable law, award monetary damages sustained by Plaintiff for the fullest time period permitted by the applicable statutes of limitations and the purported settlement and release in *In re Visa Check/MasterMoney Antitrust Litigation,* in an amount to be proved at trial, attorneys' fees, and costs of suit; and award all other and further relief as this Court may deem just and proper.

Dated:    9/10/13                    By: _____

KEITH L. BUTLER


**STRANGE & CARPENTER**
Brian Strange (lacounsel@earthlink.net)
Keith Butler
(kbutler@strangeandcarpenter.com)
12100 Wilshire Blvd., Suite 1900
Los Angeles, CA 90025
Tel: 310-207-5055
Fax: 310-826-3210


*Counsel for Live Nation Entertainment, Inc.*

Complaint

## X.   **JURY DEMAND**

Plaintiff hereby demands trial by jury of all issues properly triable thereby.

Dated: ___9/10/13___          By: _____

                                        KEITH L. BUTLER


**STRANGE & CARPENTER**
Brian Strange (lacounsel@earthlink.net)
Keith Butler
(kbutler@strangeandcarpenter.com)
12100 Wilshire Blvd., Suite 1900
Los Angeles, CA 90025
Tel: 310-207-5055
Fax: 310-826-3210


*Counsel for Live Nation Entertainment, Inc.*

Complaint

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____Ronald S.W. Lew_____ and the assigned

Magistrate Judge is _____Charles F. Eick_____ .

The case number on all documents filed with the Court should read as follows:

### 2:13-CV-6635-RSWL (Ex)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____September 10, 2013_____
Date

By  MDAVIS
Deputy Clerk

---

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

☑ Western Division
312 N. Spring Street, G-8
Los Angeles, CA 90012

☐ Southern Division
411 West Fourth St., Ste 1053
Santa Ana, CA 92701

☐ Eastern Division
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Failure to file at the proper location will result in your documents being returned to you.**

ORIGINAL

Brian R. Strange, 103252
Keith L. Butler, 215670
Strange & Carpenter
12100 Wilshire Blvd., Suite 1900
Los Angeles, California 90025
Tel: (310) 207-5055; Fax: (310) 826-3210

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Live Nation Entertainment, Inc., | CASE NUMBER |
| PLAINTIFF(S) | **CV13-06635-** _RSWL (Ex)_ |
| v. | |
| Visa, Inc.; Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International Incorporated; and Does 1-10, | **SUMMONS** |
| DEFENDANT(S). | |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Brian R. Strange, Strange & Carpenter_ , whose address is _12100 Wilshire Blvd., Suite 1900, Los Angeles, California 90025_ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____SEP 1 0 2013_____

By: _____
            Deputy Clerk

(Seal of the Court)

_[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)]._

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| **I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ ) | **DEFENDANTS** ( Check box if you are representing yourself ☐ ) |
|---|---|
| Live Nation Entertainment, Inc. | Visa, Inc.; Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International Incorporated; and Does 1-10 |
| **(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Brian R. Strange, 103252;   Keith L. Butler, 215670    Tel: (310) 207-5055<br>Strange & Carpenter<br>12100 Wilshire Blvd., Suite 1900<br>Los Angeles, California 90025 | **(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Unknown |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No      ☐ **MONEY DEMANDED IN COMPLAINT:** $ over $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.) This case is filed under Section 4 of the Clayton Act, 15 U.S.C. Section 15, for damages resulting from violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C.  Plaintiff challenges the collusive and anticompetitive practices of Defendants under the antitrust laws of the United States and the State of California.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☒ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

FOR OFFICE USE ONLY:  Case Number:   CV13-06635

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ NO   ☒ YES

If yes, list case number(s):   See Attached List _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different Judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Principal Place of Business: Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Visa, Inc.: Delaware; Visa U.S.A., Inc.: Delaware; Visa International Service Association: Delaware; MasterCard Incorporated: Delaware; MasterCard International Incorporated: Delaware |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____ DATE: September 10, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

## ATTACHMENT TO CIVIL COVER SHEET

**VIII(b). RELATED CASES: Have any cases been previously filed in this court that are related to the present case?**

1.   *Cox Media Group, LLC v. Visa, Inc.; Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International Incorporated; and Does 1-10*; Case Number 2:13-cv-6602-GW (SHx)

2.   *Cox Communications, Inc. v. Visa, Inc.; Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International Incorporated; and Does 1-10*; Case Number 2:13-cv-6604-DDP (JEMx)

3.   *Cox Enterprises, Inc. v. Visa, Inc.; Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International Incorporated; and Does 1-10*; Case Number 2:13-cv-6603-DMG (RZx)

4.   *Manheim, Inc. v. Visa, Inc.; Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International Incorporated; and Does 1-10*; Case Number 2:13-cv-6600-RGK (JCx)

5.   *AutoTrader Group, Inc. v. Visa, Inc.; Visa U.S.A., Inc.; Visa International Service Association; MasterCard Incorporated; MasterCard International Incorporated; and Does 1-10*; Case Number 2:13-cv-6601-CAS (VBKx)